Margaret MAJOR, et al.

v.

CSX TRANSPORTATION, et al.

No. CIV.A. DKC 96–3940.

United States District Court,
D. Maryland.

Aug. 18, 2003.

Sandra Harlen Benzer, Stephen B. Caplis, Natalie M. McSherry, Melissa Lynn Menkel, Whiteford, Taylor, and Preston, Baltimore, MD, for Defendants.

Roger A. Doumar, Thomas C. Summers, Law Offices of Peter G. Angelos, Baltimore, MD, for Plaintiff/Indexed Party.

William F. Gately, Howell and Gately, Baltimore, MD, for Plaintiff.

Mark Gebauer, Eckert, Seamans, et al., Harrisburg, PA, for Defendant.

James E. Gray, Venable, Baetjer and Howard, LLP, Baltimore, MD, for Defendant.

James T. Holden, InfoPlanet Voice & Data, Inc., La Jolla, CA, for Defendant.

David H. Hollander, Jr., Goodell, DeVries, Leech and Dann, LLP, Baltimore, MD, for Defendant.

Edwin David Hoskins, The Law Offices of David E. Hoskins, LLC, Baltimore, MD, for Plaintiff.

Warren L. Simpson, Jr., John E. Kawczynski, Graham E. Robb, Weber, Gallagher, Simpson, Stapleton, Fires and Newby, LLP, Philadelphia, PA, for Defendant.

Michael B. MacWilliams, Venable, Baetjer, and Howard, LLP, Baltimore, MD, for Defendant.

Lawrence M. Mann, Alper and Mann, PC, Washington, DC, for Plaintiff.

Douglas F. Murray, Whiteford, Taylor and Preston, Baltimore, MD, for Defendant.

Eric Lee Siegel, Henrichsen, Siegel, PLLC, Washington, DC, for Plaintiff.

George A. Weber, III, Law Offices of Peter G. Angelos, Baltimore, MD, for Plaintiff.

Steven M. Weisbaum, The Weisbaum Law Firm, Washington, DC, for Plaintiff.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this case arising from a train collision are: (1) the motion of Defendant CSX Transportation, Inc. (CSXT) for summary judgment; (2) the motion of Defendant National Passenger Railroad Corporation (Amtrak) for summary judgment; and (3) the motion of both Defendants CSXT and Amtrak to strike Plaintiff's references to National Transportation and Safety Board (NTSB) report materials. The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For reasons that follow, the court will grant in part and deny in part Defendants' motion to strike; grant in part and deny in part CSXT's motion for summary judgment; and deny Amtrak's motion for summary judgment.

## I. Background

Plaintiff Margaret Major is the surviving widow of James Major, (Decedent or Mr. Major), and the mother of Decedent's child James M. Major. At the time of the accident, Decedent was the conductor of MARC train 286. Plaintiff brings claims against Decedent's employer, CSXT, pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (FELA) and against Amtrak for "negligence, wrongful death, and survival action." Paper no. 35, at 8.

The following facts are uncontroverted. On February 16, 1996, a fatal collision occurred between MARC train 286, a commuter train operated by Defendant CSXT, and Amtrak train 29, operated by Defendant Amtrak in Silver Spring, Maryland.

Wayside signal 1124–2 is located approximately 1000 feet west of Kensington Station and displayed an "approach" indication when MARC train 286 passed it.[1] The "approach" indication meant that MARC train 286 should proceed at a speed no greater than 30 mph and be prepared

---

[1] While Plaintiff takes issue with the conclusion that the signal displayed an "approach" indication, as will be discussed below, there is no evidence to support her view.

to stop at the next signal, which was located at Georgetown Junction. Signal 1124–2 displayed an "approach" indication because Amtrak train 29 was traveling on the same track in the opposite direction. Amtrak train 29 was to cross over to another track at Georgetown Junction.

After passing signal 1124–2, MARC train 286 stopped at Kensington Station to pick up a passenger. After the passenger had boarded, instead of proceeding in accordance with the "approach" indication, the MARC crew operated their train at a speed of approximately 66 mph. The signal at Georgetown Junction displayed a "stop" indication to stop oncoming traffic in order to permit Amtrak train 29 to cross over to the other track At approximately 5:39 p.m., Amtrak train 29 came around a bend just east of the crossover at Georgetown Junction. As the Amtrak train came out of the bend, its crew saw MARC train 286 approaching it head-on on the same track at a speed of 66 mph. The Amtrak crew assessed the situation and Donald Noble (Noble), the engineer of Amtrak train 29, chose to try to accelerate the train in an attempt to enter the crossover so that the collision would result in a glancing blow to the baggage cars of the Amtrak train rather than a head-on collision. Although Noble was able to avoid a head-on collision, the collision nevertheless left 11 people on MARC train 286, including Decedent, dead. None of the passengers, staff, or crew of Amtrak train 29 suffered fatalities.

There is little direct evidence of what the CSX crew[2], all of whom died in the collision, were doing immediately before and at the time of the collision. John Breeden, Jr., a CSX engineer on a westbound train traveling just ahead of the

AMTRAK train, testified that he heard Mr. Orr call the signal at Kensington but did not hear the aspect, probably because of a defect in the radio system. Paper no. 275, Ex. M, at 458. The event recorder data reflect that the CSX train was traveling at approximately 66 mph before the collision, at 64 mph at the time the crew applied the emergency braking when the Georgetown "stop" signal came into view, and at a speed of between 46 and 38 mph at the time of impact. Evidence concerning the duties of the various crew members will be discussed below.

## II. Motion to Strike

CSXT and Amtrak move to strike references that Plaintiff makes in her Oppositions to Defendants' summary judgment motions to non-factual information from the NTSB Report concerning the accident underlying the case at bar. Defendants include a list of what they argue are offending references from Plaintiff's Oppositions and should be stricken. Paper no. 277, Appendix A.

Plaintiff acknowledges that NTSB conclusions and findings are not admissible at trial, pursuant to the Independent Safety Board Act of 1974 (Safety Act), 49 U.S.C. § 1154(b), which states:

> Reports.—No part of a report of the [NTSB], related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from a matter mentioned in the report.

*Id.* The regulations adopted pursuant to the Safety Act explicitly prohibit the use of non-factual portions of NTSB reports. As stated at 49 C.F.R. § 835.2:

> Definitions.

**2.** In addition to Mr. Major, the CSX crew consisted of David Orr, the engineer, and

James Quillen, the assistant conductor.

Board accident report means the report containing the Board's determinations, including the probable cause of an accident, issued either as a narrative report or in a computer format ("briefs" of accidents). Pursuant to section 701(e) of the Federal Aviation Act of 1958 (FA Act), and section 304(c) of the Independent Safety Board Act of 1974 (49 U.S.C. 1154(b)) (Safety Act), no part of a Board accident report may be admitted as evidence or used in any suit or action for damages growing out of any matter mentioned in such reports.

Factual accident report means the report containing the results of the investigator's investigation of the accident. The Board does not object to, and there is no statutory bar to, admission in litigation of factual accident reports. In the case of a major investigation, group chairman factual reports are factual accident reports.

Courts have consistently held that "the factual portions of a NTSB report are admissible into evidence, while excluding any agency conclusions on the probable cause of the accident." *Hurd v. United States*, 134 F.Supp.2d 745 (D.S.C.2001), *aff'd*, 34 Fed.Appx. 77 (4th Cir.2002); *Travelers Ins. Co. v. Riggs*, 671 F.2d 810, 816 (4th Cir.1982) ("[§ 1154(b)] forbids the use of conclusory sections of NTSB reports, and [we] thus hold that the district court properly excluded them.").

■ Plaintiff notes that she is not asking the court to rely upon the NTSB opinions and conclusions from its Report with respect to issues of probable cause of the accident and the responsibility and negligence of Defendants. Instead, Plaintiff seeks to advise the court, in response to Defendants' challenges to Plaintiff's experts and expert opinions, that the NTSB essentially agrees with Plaintiff's experts. The fact remains, however, that on a mo-

tion for summary judgment, the court may only consider evidence that is admissible. Fed.R.Civ.P. 56(e); *see Maryland Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir.1991).

■ Plaintiff argues that only conclusions or opinions from an NTSB Report that relate to fault or probable cause should be inadmissible and that other conclusions or opinions may still be admissible. The case on which Plaintiff relies for this proposition, *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), is a Supreme Court case that addresses admissibility under an exception to the hearsay rule; not admissibility under the Safety Act. Plaintiff has not provided any support that this distinction between conclusions and opinions that do and do not relate to probable cause applies to the Safety Act. References to NTSB opinions and conclusions rendered inadmissible by the Safety Act must be stricken, therefore, regardless of whether they are used to address issues of probable cause and negligence or to bolster the credibility of experts and their opinions.

Plaintiff also argues that references set forth on pages 6 and 14 of the Opposition to Amtrak's summary judgment motion do not reference matters related to conclusions or opinions of the NTSB and therefore are admissible and should not be stricken. Plaintiff argues that those were references to factual information in the NTSB Report regarding drawings, depictions, or references to the positioning of individuals prior to, and after, the collision at issue. Defendant counters that the references at pages 6 and 14 of Plaintiff's Amtrak Opposition, as direct citations to the "Accident Narrative" provided in the beginning of the NTSB Report, Paper no. 275, Ex. A, are hearsay references to other factual materials like recorder data and witness accounts that are inadmissible in

civil actions like the current one. Defendant overlooks, however, the public records exception to the hearsay rule which applies to:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8). The Fourth Circuit has observed that "[t]he admissibility of a public record specified in the rule is assumed as a matter of course, unless there are sufficient negative factors to indicate lack of trustworthiness, in which case it should not be admitted. The party opposing admission has the burden to establish unreliability." *Zeus Enterprises, Inc., v. Alphin Aircraft, Inc.,* 190 F.3d 238, 241 (4th Cir.1999), *citing Ellis v. Int'l Playtex, Inc.,* 745 F.2d 292, 300–01 (4th Cir.1984).

▮▮▮ The portions of the NTSB Report cited by Plaintiff in her Amtrak Opposition are not excludable as references to NTSB conclusions or opinions pursuant to the Safety Act and its regulations because they are part of the factual investigation narrative of the NTSB Report rather than the analysis, findings, or recommendations sections of the Report. The references to the Report on pages 6 and 14 of Plaintiff's Amtrak Opposition are also not excludable as hearsay because the NTSB Report qualifies as a public record as defined in Rule 803(8) and Defendant has not identified sufficient negative factors to indicate lack of trustworthiness or reliability. Defendants' motion to strike will therefore be granted in part and denied in part. Plaintiff's references to the NTSB Report in the footnotes on pages 18 and 38 and in the text on page 38 of the CSXT Opposition

will be stricken as prohibited by the Safety Act. Plaintiff's references to the NTSB Report on pages 6 and 14 of the Amtrak Opposition will not be stricken.

## III. Motions for Summary Judgment

### A. Standard of Review

It is well established that a court may grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979). A material fact is one that constitutes an element that is essential to a party's case. *Celotex v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. 2548. As the Supreme Court stated in *Anderson,* "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 477 U.S. at 248, 106 S.Ct. 2505.

A genuine issue as to a material fact exists if the evidence that the parties present to the court is sufficient to indicate the existence of a factual dispute that could be resolved in the non-moving party's favor through trial. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. While it is the movant's burden to show the absence of a genuine issue of material fact, *Pulliam Investment Co., Inc. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987), it is the non-moving party's burden to establish its existence. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S.

574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence that the non-moving party presents to this end must be more than a "mere scintilla," *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984), more than "merely colorable," *Celotex v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548, and more than "some metaphysical doubt." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. In order for the non-moving party to survive summary judgment, it must present evidence that is "significantly probative." *Celotex v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548.

Applying these principles, Defendants' motions for summary judgment shall be considered below while the inferences that the court draws from the facts and evidence presented shall be viewed "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Pulliam,* 810 F.2d at 1286; *Gill,* 773 F.2d at 595.

### B. CSXT's Motion for Summary Judgment

■ Plaintiff brings claims under the Federal Employee Liability Act (FELA), 45 U.S.C. §§ 51–60, against Defendant CSXT. The FELA provides that:

[e]very common carrier by railroad … shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce … for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

*Id.,* 45 U.S.C. § 51. The question of negligence is determined by "common law prin-

ciples as established and applied by the federal courts." *Brown v. CSX Transp.,* 18 F.3d 245, 249 (4th Cir.1994). To establish liability under FELA, a plaintiff must prove that he was injured while in the scope of his employment, his employment was in furtherance of the employer's interstate transportation business, the employing railroad was negligent, and the employing railroad's negligence caused, at least in part, the injury for which compensation is sought. *Id.* A relaxed standard of causation applies under FELA; a plaintiff need only demonstrate the slightest bit of evidence of employer negligence, although there is no strict liability under the FELA and an employer's fault or negligence cannot be inferred simply from the fact of an accident's occurrence. *See, e.g., Atlantic Coast Line Ry. Co. v. Collins,* 235 F.2d 805 (4th Cir.1956).

Plaintiff's FELA claims against CSXT are based upon her contentions that: (1) the signal system design was defective because a signal previously located east of Kensington Station was removed and because CSXT did not retain "three block, four indication signaling"; (2) the signal west of Kensington Station was defective and did not display an "approach" indication, but displayed a false "proceed" indication instead; (3) CSXT was negligent in maintaining an exception for passenger trains like MARC 286, to its Operating Rule 269 which requires a train stopping in a block to proceed at 30 mph and prepare to stop; (4) CSXT was negligent because it did not maintain cab signal and automatic stop technology in its passenger trains on this line; (5) the dispatcher operating the line on which the collision occurred, Crawford Boggs (Boggs), was negligent in not warning the engineers of Amtrak train 29 and MARC train 286 that they were on the same track and by taking a personal phone call during his shift; and (6) CSXT was

also negligent due to errors by other CSX crew members.

### 1. Preemption by the FRSA

#### a. Background: the Signal System

The following background of the signal system governing the movements of Amtrak train 29 and MARC train 286 is provided by CSXT and uncontroverted by Plaintiff. In May of 1987, the Maryland Department of Transportation, State Railroad Administration (SRA), applied for and received a federal grant to install a Centralized Traffic Control System (TCS) on the MARC/CSXT Brunswick and Camden lines. The project consisted of reconfiguring and relocating tracks and switches and adding bi-directional signals. Part of the upgrade included removing two track-side, one-directional signals along the Brunswick line near Georgetown Junction and installing one bi-directional track-side signal. During the reconfiguration, due to the re-spacing of the signal system, Signal 100, which was located east of Kensington Station, was removed and a new, bi-directional system was installed west of Kensington Station. The location of the signals in the TCS system were determined by braking distances of the trains which would be operated on the line, which included substantial freight traffic.

The upgrade of the signal system was completed in 1992. A central computer displayed train movements on an electric wallboard and calculated the maximum amount of bi-directional traffic that could move safely. The system was regularly inspected and tested by the Federal Railroad Administration (FRA) to ensure that it complied with its regulations and rules. The FRA never found fault with the upgraded signal system. Even after the collision, the signal investigation team which included representatives from the NTSB, the FRA, the State of Maryland, the union, and CSXT tested the signal system including signal 1124–2 and all signals that governed movement at Georgetown Junction and found that every test indicated that the signals worked as intended.

#### b. Discussion

CSXT argues that Plaintiff's claims of defective signal system design and operation are preempted by the Federal Railroad Safety Act (FRSA). The FRSA was enacted in 1970 by Congress "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). The FRSA also contains an express preemption provision:

> Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C. § 20106.

■ Preemption of state or local laws occurs by operation of the Supremacy Clause of the United States Constitution when (1) Congress expressly defines the extent to which federal law preempts state law; (2) state law regulates conduct in a field that Congress intended the federal government to occupy exclusively; (3) it is impossible to comply with both state and federal requirements; or (4) the state law poses an obstacle to the accomplishment and execution of congressional purposes. *See Civil City of South Bend, Indiana v. Consolidated Rail Corp.*, 880 F.Supp. 595, 599 (N.D.Ind.1995), *citing Cipollone v.*

*Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 2617–18, 120 L.Ed.2d 407 (1992). In this case, Plaintiff brings her claim against CSXT under the FELA—a federal law. CSXT essentially argues, therefore, that the FRSA should preempt FELA claims related to subject matter that is covered by regulations promulgated by the Secretary of Transportation.

■ Several district courts have held that FELA claims may be preempted by the FRSA. *See, e.g., In re: Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama, on September 22, 1993*, 188 F.Supp.2d 1341, 1348 (S.D.Ala.2000) ("The FELA claims by the railroad employees, like the general maritime claims by the passengers, are negligence based.... Like common law negligence claims, FELA negligence claims may not be used to impose duties beyond those imposed by Congress or the FRA—that is, FELA claims may, indeed, be subject to preemption.") (citing *Thirkill v. J.B. Hunt Transp., Inc.*, 950 F.Supp. 1105, 1107–08 (N.D.Ala.1996)); *see also Rice v. Cincinnati, New Orleans & Pacific Railway Co.*, 955 F.Supp. 739, 741 (E.D.Ky.1997). In *Rice*, a train accident case in which the plaintiff challenged a train's excessive speed as negligence on the part of the employer railroad, the court reasoned that:

> [i]f a plaintiff were allowed to argue unsafe speed under the FELA but not under state law, the railroad safety uniformity intended by Congress would be compromised. The FRSA therefore supersedes plaintiff's FELA action insofar as it asserts that the train was traveling at an unsafe speed, provided that the speed is in keeping with the FRSA regulation.

*Id.*, 955 F.Supp. at 741. At least one district court has concluded that a plaintiff's FELA claims based on allegations of excessive speed are *not* preempted by the

FRSA. In *Earwood v. Norfolk So. Ry. Co.*, 845 F.Supp. 880 (N.D.Ga.1993), the court, noting that FELA is the exclusive remedy for injured railroad employees, concluded that the plaintiff's FELA claims were not preempted because the statutes' purposes did not conflict. *Id.*, 845 F.Supp. at 891. Regardless of their divergent conclusions, the district courts are agreed that a FELA claim may be preempted by the FRSA. The relevant question to consider, therefore, is whether the FRSA or an accompanying federal regulation covers the same subject matter that forms the basis of the FELA claim.

■ For preemption to take effect, "the federal regulation must 'cover' the same subject matter, and not merely 'touch upon' or 'relate to' that subject matter." *Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 352, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000) (internal citations omitted). In this case, Plaintiff bases her FELA claim in part on the contentions that CSXT negligently removed the wayside signal between Kensington Station and Georgetown Junction, Paper no. 35, at ¶ 20(c), negligently used a signal system, *id.*, at ¶ 20(d), failed to correct alleged ongoing signal failures, *id.*, at ¶ 20(e), violated the Signal Inspection Act and its regulations, *id.*, at ¶ 20(*o*), and "did not maintain three block, four indication signaling ... in the signal design with respect to eastbound trains approaching a Stop Signal at Georgetown Junction, [that] if present, would have prevented this accident." Paper no. 274, at 18. CSXT argues that because FRSA regulations contained at 49 C.F.R. §§ 235–236 cover the subject matter of design, installation, and modification of railroad signal systems, Plaintiff's claims regarding the operation and design of the signal system must be preempted.

CSXT points out that 49 C.F.R. § 235.1 defines the scope of part 235 as prescribing "application for approval to discontinue or materially modify block signal systems, ... traffic control systems, ... or other similar appliances, devices, methods, or systems ...." Part 235.5 requires the filing of an application to cover the discontinuance or the modification of a block signal system. Part 236, entitled "Rules, Standards, and Instructions Governing the Installation, Inspection, Maintenance, and Repair of Signal and Train Control Systems, Devices, and Appliances," devotes seven subparts to the regulation and design of signal systems. Part 236, sub-part A "Rules and Instructions: All Systems," requires that "[w]here a passenger train is operated at a speed of 60 or more miles per hour, or a freight train is operated at a speed of 50 or more miles per hour, a block signal system complying with the provisions of this part shall be installed or a manual block system shall be placed permanently in effect ...." 49 C.F.R. § 236.0(c). Part 236.21 requires each roadway signal to be "positioned and aligned so that its aspect can be clearly associated with the track it governs." *Id.* Part 236.24 requires that:

> [e]ach roadway signal shall be located with respect to the next signal or signals in advance which govern train movements in the same direction so that the indication of a signal displaying a restrictive aspect can be complied with by means of a brake application, other than an emergency application, initiated by such signal, either by stopping at the signal where a stop is required, or by a reduction in speed to the rate prescribed by the next signal in advance where reduced speed is required.

*Id.* Sub–Part B of 49 U.S.C. § 236 sets forth the standards for automatic block signal systems and Sub–Part D lays out the standards for traffic control systems.

Plaintiff argues that, despite CSXT's citations to Parts 235 and 236, "the complete federal control and all-encompassing federal regulations" which might permit a finding of preemption are not present. Plaintiff contends that 49 C.F.R. § 235 has no relevance to this case because the signal project was an "upgrade" for which an application was not required to be filed. Plaintiff also argues that there is no evidence of intent by the Secretary of Transportation or FRA to assume jurisdictional regulatory power over the modification of the signal system in this case.

The relevant question in this preemption analysis remains, however, whether the FRSA and its regulations "cover" the same subject area on which Plaintiff attempts to base part of her FELA negligence claim. Based on the regulations set forth at 49 C.F.R. §§ 235 and 236, it appears that the parts of Plaintiff's FELA claim based on negligent design or operation of the signal system can be preempted. Whether they *are* preempted hinges on whether the federal regulations *actually* governed the signal system in question.

■ CSXT argues that the very fact that federal funds were used for the system modernization indicates the Secretary of Transportation's approval of a signal system design. Citing the Supreme Court's holding in *Norfolk Southern,* among other cases, CSXT notes that the receipt of federal funding is the "cornerstone of preemption." As Plaintiff correctly points out, however, the cases in which courts have concluded that federal funding is determinative of federal approval, thereby triggering preemption, have addressed claims challenging the adequacy of warnings at roadway/railway crossings. *See Ingram v. CSX Transp.,* 146 F.3d 858 (11th Cir.1998); *Michael v. Norfolk Southern Ry. Co.,* 74 F.3d 271 (11th Cir.1996).

This is because 23 C.F.R. § 646.214(b)(3) and (4) establish a federal requirement that certain protective devices be installed or federal approval be obtained if federal funds participate in the installation of warning devices at railroad crossings. *Id.; see CSX Transp. v. Easterwood,* 507 U.S. 658, 670, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In those cases, therefore, the participation of federal funds becomes indicative of federal approval. However, there is no comparable requirement in 49 C.F.R. §§ 235 and 236. The fact that CSXT received $ 9.8 million in federal funds to complete the upgrade of the signal system does not in itself indicate federal approval or even review of the system's design and operation guidelines.

█ Plaintiff proffers evidence that: (1) the FRA had no part in the review, approval, or inspection of the signal changes on the Brunswick line during the course of planning and construction of the signal re-spacing project because CSXT was not required to file an application for these changes since they were considered an "upgrade," Paper no. 274, Ex. O, at 275, li. 19–21; *id.,* at 257 and 276; (2) the FRA never determined whether the signal re-spacing provided adequate braking distances prior to the modification, *id.,* at 271, li. 11; (3) the only approval the FRA gave CSXT regarding the Brunswick line upgrades related to braking distance adequacy and not the design of the signal system as a whole, *id.,* at 276; (4) the FRA never reviewed or approved the proposed signal changes, *id.,* at 270–71 and 276; (5) CSXT had exclusive control over the design, installation, and operation of the signals system while the MTA had the right to review and comment on the design and construction plan, *id.,* Ex. A; and (6) neither the FRA nor the MDOT/MTA reviewed the CSXT design of the proposed signal system modification installation. *Id.,* Ex. A,

at 43. Nevertheless, CSXT has provided evidence in the form of deposition testimony from David Nethken, its former district engineer of signals, that the signal system on the line on which the Amtrak and MARC trains in this case were traveling was regularly inspected and tested by the FRA to ensure that it complied with its regulations and rules. Paper no. 270, Ex. 13, at 69–70. Plaintiff has not challenged CSXT's establishment of this fact or Nethken's testimony. Thus, regardless of whether the federal government played an active role in the pre-installation preparations of the signal system modification, it is uncontroverted that the federal government did apply its regulations and requirements that cover signal systems operation and design to CSXT's system through inspection and testing once it was installed. Plaintiff's FELA claims based on the design and operation of CSXT's signal system is therefore not only preemptable, but also preempted here by the FRSA. CSXT's motion for summary judgment on Plaintiff's defective signal claims will be granted.

### 2. Claim That "Reminder" Signal Would Have Prevented the Accident

█ It is uncontroverted that three years before the accident occurred, CSXT removed Signal 100, which had been located between Kensington station and the Georgetown Signal where the collision occurred. Plaintiff contends that had Signal 100 not been removed, Decedent's train would have had prior warning of the need to reduce speed before approaching the red signal at Georgetown, and that the changes made to the signal system had no safety justification. Paper no. 35, at 5, ¶ 16. Plaintiff claims that the removal of the signal at mile marker 100 may have caused the accident by depriving Decedent and his crew of a "reminder" signal that

would have reminded them of the aspect indications displayed on previous signals.

Having concluded that the portions of Plaintiff's FELA negligence claim that are based on the signal system's design and operation are preempted, this claim is also preempted.

### 3. Requirement to Conduct a Human Factor Analysis

■ Again, to the extent that Plaintiff's claim that CSXT was negligent in failing to conduct a human factor analysis as part of its upgrade to the TCS signal system is a challenge to the operation and design of the signal system, it is preempted. Even if it were not, however, CSXT's motion for summary judgment would still be granted here.

■ In support of her claim that a human factor analysis should have been conducted, Plaintiff relies on the expert submission and deposition testimony of Robert W. Halstead (Halstead) who offers his opinion that the "removal of [Automatic Signal 100] was done without the benefit of any prior human factors safety analysis, which should have been performed . . . ." Paper no. 274, Ex. F, Att.(b), at 14, ¶ 1. Halstead's analysis consists mainly of block quotations from NTSB and other railroad safety materials that may help establish that a human factors safety analysis can be helpful to railroad systems design, but ultimately fails to show whether such an analysis would have led to any change or difference in design of the signal system in use by CSXT. Halstead does state that "[a] thorough human factors analysis would have highlighted the inherent fallibility of systems relying solely on human beings to maintain a safe environment, and would likely have recommended the installation of cab signaling as a way to reduce human error." *Id.*, at 10. Nevertheless, this conclusion of Halstead's appears unreliable and conclusory as it is

unsupported by any facts or data, and not connected to the information set forth in the block quotations by any clear reasoning. Regardless of whether it is preempted by the FRSA, therefore, the court will grant Defendant's motion for summary judgment on Plaintiff's claim regarding CSXT's failure to employ a human factors safety analysis in designing its signal system.

### 4. Evidence that Signal 1124–2 Displayed a False Proceed Indication

■ One of the theories of liability that Plaintiff advances is that signal 1124–2 at Kensington Station failed to display an approach aspect. *See* Paper no. 35, at 3, ¶ 10. CSXT notes that Plaintiff has failed to identify any evidence establishing that signal 1124–2 malfunctioned or failed to display an approach signal that required MARC train 286 to slow to 30 mph. CSXT points out that there is no deposition testimony by experts on either Plaintiff or CSXT's side that supports the contention that signal 1124–2 did not correctly display an approach indication. Furthermore, Plaintiff concedes that the post-accident investigation revealed a functioning signal system.

Given that there is no direct evidence of what the signal actually indicated on the day of the accident because there are no surviving crew members who would have witnessed the signal, Plaintiff relies for support only on the inference that it is unlikely that two members of the MARC train crew would have operated the train in violation of a correctly displayed approach signal and the fact that false proceed indications have occurred on this line both before and after the accident. On a motion for summary judgment, however, it is Plaintiff's burden to establish the existence of a genuine issue of material fact. The evidence that Plaintiff proffers here is

barely more than "some metaphysical doubt." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Even drawing the inferences from Plaintiff's proffered support in the light most favorable to Plaintiff, the court must grant Defendant's motion for summary judgment on Plaintiff's claim based on the theory that signal 1124–2 displayed a false proceed indication on the day of the accident.

### 5. The Exemption to Rule 269 for Passenger Trains

 Plaintiff claims that the exemption for passenger trains to CSX Operating Rule 269 was a contributing cause in the collision that led to Decedent's death. Rule 269 states:

> When a train has passed a signal permitting it to proceed (other than a Restricting, a Stop and Proceed at Restricted Speed, or Grade aspect) and is stopped in the block, the train must proceed prepared to stop at the next signal. This must be done until it can be seen that the next signal permits the train to proceed.

Paper no. 270, Ex. 3, at 53. Rule 269 also contains the following exception: "[t]his rule does not apply to passenger trains making station stops ...." *Id.* Plaintiff argues that had MARC train 286 not been exempted from Rule 269, the accident would not have occurred because, upon starting up after the flag stop at Kensington, MARC train 286 would have been restricted by the operating rules from traveling at a speed faster than what would have allowed it to stop in time at the next signal. Despite the expert testimony Plaintiff proffers in support of this contention, however, the fact remains that there is no evidence that signal 1124–2 did not display an approach signal that required MARC train 286 to proceed at a speed no greater than 30 mph. The exemption for MARC train 286 from Rule 269's require-

ment did not exempt its crew from observing the signals governing its movement. While it may be argued that abolishing the exception to Rule 269 would be prudent, as a separate matter, for passenger rail safety, the argument is irrelevant in the present context where the apparent cause of the collision was the MARC train's failure to observe signal 1124–2's approach indication. CSXT's motion for summary judgment on Plaintiff's claim that the exemption to Rule 269 for passenger trains will therefore be granted.

### 6. Dispatcher Negligence

 Plaintiff claims that negligence on the part of the CSXT dispatcher on duty at the time of the accident, Crawford Boggs (Boggs), who was located in Jacksonville, Florida, contributed to the cause of the collision. Specifically, Plaintiff claims that the fact that Dispatcher Boggs took two personal calls during his shift and did not call the crews of MARC 286 and Amtrak 29 to warn them that they were on the same track headed for each other constitutes Boggs's negligence.

[19] In order to claim negligence on the part of Boggs, Plaintiff must establish that Boggs had a duty that he breached. *See, e.g., Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655, 762 A.2d 582 (2000). CSXT argues that, as dispatcher, Boggs's duty was simply to set up the trains so that they could travel as needed and did not include the duty of warning trains traveling on the same track when there was nothing inappropriate about the situation with one train planned to crossover to a different track before the two trains met. Furthermore, CSXT points out that there is no evidence that the signals were not appropriately set by Boggs or that he should have had any knowledge that there was any irregular activity the evening the collision occurred.

Plaintiff proffers the opinion of her experts that, based on their experience in the industry and its practice, under the circumstances on the day of February 16, 1996, Dispatcher Boggs had a duty to warn the crew members of MARC 286 and Amtrak 29 of their situation vis à vis each other. Paper no. 274, Ex. G, Beall Dep., at 55–61; *id.,* Ex. C, Westphal Dep., at 47–53. If admissible, this testimony would create a genuine issue of material fact with respect to whether Boggs had a duty to warn the train crews of their situation. CSXT argues, though, that the testimony of Plaintiff's experts Beall and Westphal is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because it is subjective belief or unsupported speculation. Both Beall and Westphal base their opinions on duties that they attest derive from industry practice or custom supported by their past experience as workers in many different capacities in the rail industry. Their testimony is therefore more than mere subjective belief or unsupported speculation. CSXT's motion for summary judgment on Plaintiff's claim of Dispatcher Boggs's negligence will therefore be denied.

### 7. Operating Crew Negligence

Once Plaintiff's claim that there is evidence to support an inference that the signal malfunctioned is eliminated, the inescapable conclusion is that the negligence of the train crew contributed to the collision; that there was an "approach" signal visible and either the crew failed to observe it correctly or at all, or saw it but forgot its aspect as they left Kensington. Plaintiff argues that negligence of other crew members, not attributable to Decedent, makes CSXT liable. It then is necessary to evaluate the evidence as it relates to the responsibilities of the various crew members, depending on their location at the critical times.

If Mr. Major was in the operating cab with the engineer when the train passed the Kensington signal, it is uncontested that both would have had an equal duty to observe, call out, and obey the signal. There is evidence, however, from which it could be found that Mr. Major was not in the control cab at the time the train passed the signal, but was in the process of preparing to board a passenger. Thus, he would have been relying on the engineer to view the signal and to report its aspect. Defendant argues that, if the engineer failed to report the signal, then Mr. Major breached a duty if he failed to inquire about it. (Had the inquiry been made, the crew would have been able to learn of the approach signal and maintain the proper speed to be able to stop at the red signal.) If the engineer saw and reported the signal as "approach," and then accelerated the train above the speed allowed for that signal once the train left Kensington, then again Mr. Major breached a duty when he failed to correct the speed.

Plaintiff's contention is, though, that when Mr. Major was not in a position to view the signal himself, he was permitted to rely that the engineer (and assistant conductor) were performing their duties correctly. The question, then, is whether Plaintiff has forecast admissible evidence that the conductor is absolved of his responsibility to know of the signal and its aspect or to make sure that the engineer complies with the signal when he is performing other duties when he is not in the control cab.

One of Plaintiff's experts plainly contradicts that assertion. Willis A. Henry, Sr., has worked for CSX and its predecessors since April of 1971, first as a brakeman, and as a conductor since 1976, on passenger trains since 1986. His route was on

the MARC line between Baltimore and Brunswick, at times including both parts, Baltimore to D.C. and D.C. to Brunswick. He testified that the conductor, assistant conductor, and engineer operated as a team and each had responsibilities. The conductor's responsibility includes making sure that the engineer is operating the train properly. Paper no. 275, Ex. B, Henry Dep., at 15–16. The engineer is required to call out signals on the radio as the train approaches a signal. The conductor, who knows where the signals are, would ask the engineer what the signal was if the engineer had not called out the signal on the radio. *Id.* at 22–23, 58, 63–64. Calling out the signal entails both acknowledging the signal and the aspect and the track. *Id.* at 51, 81. The conductor is to acknowledge that he heard the engineer call the signal. *Id.* at 54. Similarly, the assistant conductor is to call out the signal if he is in the cab with the engineer, or acknowledge hearing called out if he is not. *Id.* at 78–79.

Another proposed expert witness, on the other hand, equivocates on the point. August W. Westphal spent 15 years with Chicago Northwest Railroad as a trainman, a yardman and a conductor, both in passenger and freight service, ending in December 1960. He then became the Nebraska state representative for the Brotherhood of Railroad Trainmen. Next he worked for the Brotherhood of Railroad Trainmen as the manager of the legislative and education department, and then directly into the UTU. He retired in 1986. In February 1987, he formed Transit Operations and Personnel Guidance, providing consultation services. In 1992, he was elected as the national president of the National Association of Retired and Veteran Railway Employees.

He testified that the conductor and engineer are equally responsible for the safe operation of a train. Paper no. 275, Ex. C, Westphal Dep., at 32. The conductor should be generally aware of his territory and the signal system, but he would have to be a "psychic or a genius or a magician" to be aware of the location and the passing of every signal. *Id.* at 34. Specifically, he testified:

Q. Is it the responsibility of the conductor on passenger service to know what the governing signal is under which the train is operating at any given time?

A. Only if that conductor is in the locomotive or the control compartment of the locomotive that's handling the train.

Q. So if the conductor is not in the control area of the train, he or she has no responsibility at all to know what the signal is?

A. In my opinion, the conductor that's not in the control compartment of the locomotive could have no conception of what the signal indication is. His or her responsibility would be within the cab or the compartment where they were working in the passenger compartment of the passenger train and the other employees who are on the locomotive or in the cab control department of the train would have that responsibility to observe the indication of the signal.

Q. What is your understanding, Mr. Westphal, of the duties of various train crew members to acknowledge signals when they pass them?

A. When they're in the control compartment of the locomotive, they are supposed to call out to each other the signal indication of the train.

Q. If they are alone in the control compartment of the train, to whom do they call out that signal?

A. If they have a radio communication or if they're in direct contact with the dispatcher or if their communication

goes to other trains in the vicinity, they would just call them out.

Q. So they would call them out over the radio if there is no one else in the control area?

A. They would just call them out if the radio was on and the radio would accept the transmission.

\* \* \* \* \* \*

Q. If the radio is on and operable when the train passes a signal, what is your understanding of the responsibilities of the engineer as to that signal?

A. Is to call out the signals.

\* \* \* \* \* \*

Q. And if the conductor were not in the control area of the train, is it not your understanding that the engineer would, in fact, activate that signal so that the conductor could hear the engineer acknowledge the signal.

A. If the engineer activated only the radio and whoever had their radio on could receive—they would receive the signal.

Q. Well, I understand that they would if he did that, but do you have an understanding as to whether the engineer had a responsibility to convey the signal over the radio if the conductor was elsewhere in the train?

A. I would have no opinion on that.

*Id.* at 36–37. He reiterated his opinion that the conductor has no obligation to ask the engineer what the signal was if he doesn't hear the engineer acknowledge it.

*Id.* at 42–43.[3] If believed, over the substantial contrary evidence, this testimony would be sufficient to prove that Mr. Major did not breach a duty, but that other crew members did. Thus, summary judgment is not appropriate on Plaintiff's claim of crew error.

### C. Amtrak's Motion for Summary Judgment

Amtrak moves for summary judgment on Plaintiff's claim of negligence against it, arguing that Decedent's contributory negligence bars Plaintiff's claim under Maryland law. Plaintiff counters that the "law of the case" doctrine precludes this court's consideration of Amtrak's motion or, in the alternative, that the question of Decedent's negligence should be properly submitted to a jury.

### 1. Law of the Case Doctrine

 The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Pincus v. Pabst Brewing Co.,* 752 F.Supp. 871, 873 (E.D.Wis.1990) (quoting *Redfield v. Continental Cas. Corp.,* 818 F.2d 596, 605 (7th Cir.1987)). The doctrine applies in a situation where a court will not reconsider its own decision rendered at an earlier stage of the litigation absent clear and convincing reasons to reexamine the prior ruling. *Id.* Plaintiff argues that because the court has already ruled on the issue of any con-

---

**3.** Amtrak, in its motion for summary judgment, argues that this testimony by Westphal should be disregarded based on *Barwick v. Celotex Corp.,* 736 F.2d 946, 959 (4th Cir. 1984), which held that a plaintiff may not avoid summary judgment by offering conflicting versions of the facts. Paper no. 271, at 18, n. 11. The situation there was, however, a plaintiff who had testified to one set of facts at deposition and then later tried to controvert those facts by affidavit. Thus, it was the same witness who purportedly gave conflicting evidence. Here, there are two separate witnesses, albeit offered by the same party, who give contradictory opinions, and the court is unwilling, without further briefing on the issue, to reject Westphal's testimony on the ground that Plaintiff is prohibited from producing conflicting expert opinions.

tributory or comparative negligence on the part of Decedent and concluded that it is a question of fact for a jury, *see Major v. CSX Transp., Inc.*, 170 F.Supp.2d 563, 569–70 (D.Md.2001) (observing that "[o]utstanding issues remain not only as to the potential concurrent liability of CSXT and Amtrak for negligence. . . . [T]he court will . . . deny Amtrak's Motion for Summary Judgment because there is still a dispute as to whether Amtrak is concurrently liable at least for the extent and severity of the collision."), the court may not conclude differently here.

> According to the court in *Pincus:*
> [w]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues. Thus, it is critical to determine what issues were actually decided in order to define what is the 'law' of the case. This requires a careful reading of the Court's opinion: observations, commentary, or mere dicta touching upon issues not formally before the Court do not constitute binding determinations.

*Id.*, 752 F.Supp. at 873. A careful reading of the court's prior opinion makes clear that the issue of Decedent's contributory negligence was not decided previously. Amtrak's prior summary judgment motion applied to all plaintiffs who were involved in the action at the time and did not squarely address the matter of Decedent's contributory negligence. To the extent that the court's prior opinion does mention contributory negligence, it was only to observe that outstanding issues remained as to that matter. The law of the case doctrine therefore does not preclude consideration of Amtrak's current summary judgment motion based on Decedent's contributory negligence.

**2. Decedent's Contributory Negligence**

■■■■■■ Contributory negligence operates as an absolute bar to recovery under

Maryland law. *Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 451, 456 A.2d 894, 898 (1983) ("[A] plaintiff who fails to observe ordinary care for his own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence."). It is defined as "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." *Kassama v. Magat*, 368 Md. 113, 127, 792 A.2d 1102, 1110 (2002). The focus of the contributory negligence defense is on whether the plaintiff took appropriate precautions to protect his own interests. *Id.* While the issue of contributory negligence is generally one of fact to be decided by a jury, it becomes a matter of law when reasonable minds could not differ on the question. *Union Mem'l Hosp. v. Dorsey*, 125 Md.App. 275, 282, 724 A.2d 1272 (1999). The burden of proving contributory negligence is on the defense. *McQuay v. Schertle*, 126 Md. App. 556, 568, 730 A.2d 714, 720 (1998) (citing *Myers v. Bright*, 327 Md. 395, 403, 609 A.2d 1182 (1992)). In order to prove Decedent's contributory negligence, Amtrak must establish that Decedent breached a duty that proximately caused the accident and injuries. *See Rosenthal v. Mueller*, 124 Md.App. 170, 173–74, 720 A.2d 1264 (1998).

■■■■ Amtrak argues that there is no set of circumstances under which MARC train 286 could have been approaching Georgetown Junction at a speed of approximately 66 mph if Decedent had been performing his duties in accordance with CSX operating rules and with the degree of care required of the conductor of a train.

Amtrak asserts that it is undisputed that MARC train 286 was not operating in accordance with the "approach" signal indication governing its movement at the time of the accident. Relying on the deposition testimony of experts Willis A. Henry, William C. Benson, and Richard C. Beall and CSX Operating Rule 34–C, Amtrak asserts that, as the conductor of MARC train 286, Decedent was responsible for knowing the signal governing movement of the train and ensuring that the train was operating in accordance with that signal. If Decedent had been in the cab control car of MARC 286, it was his duty to observe the aspect of the signal himself. The engineer calls the signal and if the engineer then fails to operate the train in accordance with the signal governing movement of the train, it is the conductor's duty to take action to ensure the safety of the train, including telling the engineer to slow the train down.

Amtrak asserts that even if Decedent had not been in the cab control car at the time that MARC 286 passed signal 1124–2, the engineer was required to call the signal and if Decedent had not heard the call, it was his duty to ask the engineer the indication of the signal. It was also Decedent's duty and responsibility to know the location of all signals along the route and to ensure that the train operated in accordance with the indication of those signals. As the conductor, Decedent was ultimately responsible for the safe operation of the train.

 Plaintiff insists that the question of Decedent's contributory negligence must be reserved for a jury because an alleged violation of the CSX Operating Rules by Decedent does not automatically require a finding of negligence. Amtrak argues that "violation by a railroad employee of a railroad's operating rules and practice does constitute negligence

when the rule directly relates to the safe operation of trains and the foreseeable consequence of such a rule violation is a catastrophic train accident." Although Amtrak offers no case law in support of this principal, it may be noted that in Maryland, violation of a statute does not *per se* constitute negligence—unless the violation was a proximate cause of the injury. *Hartford Ins. Co. v. Manor Inn of Bethesda,* 335 Md. 135, 155, 642 A.2d 219, 229 (1994). The analogy to the question of whether violation of a statute is considered negligence underscores that the relevant inquiry remains whether Decedent's failure to ensure that MARC train 286 was operating in accordance with the "approach" signal in violation of CSX Operating Rules proximately caused the accident and collision.

Plaintiff asserts that "there are multiple factual scenarios and permitted inferences that could be drawn by a jury that would allow for a finding that [Decedent's] actions or inactions were not the cause (in whole or in part) of his death and/or this collision, but as a result of a multitude of other factors ...." As discussed above, there is clear, uncontradicted evidence that CSXT crew error of some sort contributed to the cause of the collision, but it is not undisputed that Mr. Major was himself negligent. On the slim reed of Mr. Westphal's testimony, Plaintiff may contend that he was absolved of responsibility for knowing and obeying the approach signal if he was attending duties away from the control cab.

 The court notes, moreover, that, having concluded that a genuine issue of material fact exists with respect to whether Dispatcher Boggs's acts or omissions may have contributed to causing the accident, a factual dispute also exists here regarding whether Decedent's violation of CSX rules and breach of duty proximately

caused the accident. Amtrak's motion for summary judgment based on Decedent's contributory negligence will therefore be denied.[4]

### 3. Amtrak's Negligence in Responding to Imminent Collision

 Amtrak argues that even if Plaintiff's claim against it is not barred by Decedent's contributory negligence, there is insufficient evidence to establish that Amtrak's negligence caused the collision and Decedent's death. To establish negligence, Plaintiff must demonstrate that Amtrak owed a duty to Plaintiff, breached that duty, a causal relationship exists between the breach and the harm, and that damages were suffered. *See Walpert, Smullian & Blumenthal,* 361 Md. at 655, 762 A.2d 582. Amtrak argues that the crew of Amtrak train 29, including Engineer Noble in particular, did not breach a duty owed to Decedent when confronted with oncoming Marc 286 and that there is no causal relationship between any action or inaction by Noble and the injuries caused to Plaintiff.

 A genuine issue of fact exists as to whether Noble breached a duty when he chose to accelerate Amtrak train 29 instead of braking when confronted with the imminent collision with MARC train 286. Plaintiff proffers the testimony and submissions of her experts and Amtrak's Answer to Interrogatory No. 24 in support of the contention that Noble's acceleration was contrary to all accepted standards and procedures for an engineer when faced with an imminent collision. Paper no. 275, Ex. F, Att. (a), at 3, ¶ 5; *id.,* Att. (d), at 3, ¶ 5; *id.,* Ex. G, at 63–69; *id.,* Ex. C, at 55–63; *id.,* Ex. E, at 34, li. 5–20; *see also Major v. CSXT,* 170 F.Supp.2d at 568. In terms of the question of causation, Amtrak argues that even Plaintiff's experts acknowledge that there was nothing Noble could have done to avoid the collision once the two trains became aware of their situation. Nevertheless, a question of fact still remains as to whether Noble's action in accelerating Amtrak train 29 caused the severity of the collision that resulted in 11 deaths on MARC train 286. Amtrak argues that the evidence that Plaintiff presents to support her contention that Amtrak train 29's deceleration may have mitigated the severity of the collision's injury and harm by allowing Decedent and other occupants of MARC train 286 more time to escape from the front of the train and by decreasing the level of impact between the two trains, *see* Paper no. 275, Ex. F, Att. (c), at 2, ¶ 4; *id.,* Ex. H, at 47, is speculative. Plaintiff's burden on this motion for summary judgment, however, is not to establish causation as a certainty but merely to establish the existence of a factual dispute over causation. Having done so, Amtrak's motion for summary judgment

---

4. Plaintiff also invokes the "last clear chance" doctrine in arguing against Amtrak's motion for summary judgment. Plaintiff is unable to avail herself of the doctrine. The last clear chance doctrine allows a contributorily negligent plaintiff to recover damages from a negligent defendant if: (1) the defendant is negligent; (2) the plaintiff is contributorily negligent; and (3) the plaintiff makes a showing of something new or sequential, which affords the defendant a fresh opportunity, of which he fails to avail himself, to avert the consequences of the original negligence. *Burdette v. Rockville Crane Rental, Inc.,* 130 Md.App. 193, 216, 745 A.2d 457, 469 (2000). Plaintiff argues that, assuming Decedent was contributorily negligent, Noble's decision to accelerate Amtrak train 29 instead of decelerating it was either the original act of negligence on the part of Amtrak or the fresh opportunity which Amtrak failed to seize to avert the consequences of the original negligence. Noble's decision to accelerate Amtrak train 29 cannot be both the original act of negligence and the opportunity to avert the accident.

based on Noble's negligence will be denied.

## IV. Conclusion

For the foregoing reasons, the court will (1) grant in part and deny in part Defendants' motion to strike; (2) grant CSXT's motion for summary judgment on Plaintiff's claims of negligence against it based on the operation and design of the signal system (including the claims that a reminder signal would have prevented the accident and that CSXT was required to conduct a human factors analysis as part of its upgrade of the signal system), the claim that signal 1124–2 displayed a false proceed signal, and the exemption to CSX Operating Rule 269 caused the collision; (3) deny CSXT's motion for summary judgment as to Plaintiff's claims of negligence by other crew members and on the part of Dispatcher Boggs; and (4) deny Amtrak's motion for summary judgment. A separate order will follow.

### ORDER

For the reasons stated in the foregoing memorandum opinion, it is this 18th day of August, 2003, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Defendants CSXT and Amtrak to strike Plaintiff Margaret Major's references to NTSB report materials (paper no. 277) BE, and the same hereby IS, GRANTED in part and DENIED in part;

2. Plaintiff's references to NTSB report materials in the footnotes on pages 18 and 38 and in the text on page 38 of her Opposition to CSXT's motion for summary judgment BE, and the same hereby ARE, STRICKEN;

3. CSXT's motion for summary judgment (paper no. 270) BE, and the same hereby IS, GRANTED in part and DENIED in part;

4. Judgment BE, and the same hereby IS, ENTERED in favor of CSXT and against Plaintiff on Plaintiff's claims (1) of negligence based on signal system design and operation, (2) that a reminder signal would have prevented the accident, (3) that CSXT was required to conduct a human factors analysis as part of its upgrade of the signal system, (4) the claim that signal 1124–2 displayed a false proceed signal, and (5) the exemption to CSX Operating Rule 269 caused the collision;

5. Amtrak's motion for summary judgment (paper no. 271) BE, and the same hereby IS, DENIED; and

6. The Clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.